**21SL-CC00337**

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

## IN THE CIRCUIT COURT FOR ST. LOUIS COUNTY
## STATE OF MISSOURI

| | |
|---|---|
| **MICHAEL MULLER,** | ) |
| *individually and on behalf of* | ) |
| *all others similarly situated,* | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **CONOPCO, INC.,** *d/b/a* **"UNILEVER,"** | ) |
| **DOES 1 through 10,** | ) |
| | ) |
| **Defendants.** | ) |

**Case No. _____**

**JURY TRIAL DEMANDED**

## CLASS ACTION PETITION

Plaintiff Michael Muller, individually and on behalf of all others similarly situated, hereby files this, his Second Amended Class Action Complaint, against Defendant Conopco, Inc., *d/b/a* "Unilever" and DOES 1 through 10 (collectively "Defendants") for their false, misleading, and deceptive marketing of their products constituting, on a nationwide basis, breach of warranty, breach of implied contract, and unjust enrichment, and, in the state of Missouri, violations of the Missouri Merchandising Practices Act, Mo. Rev. Stat. chap. 407 ("MMPA").

## I.    INTRODUCTION

1.    Defendant Unilever markets and sells many different consumer products, including deodorant and antiperspirant sticks.  One such product is "Axe"-branded antiperspirant featuring so-called "Anti Marks Protection."

2.    The "Anti Marks Protection" line of Axe antiperspirants is deceptively and misleadingly marketed as having an "Anti Marks Protection" benefit and producing "No Yellow Stains" and "No White Marks."

3.    However, despite those claims, the "Anti Marks Protection" line of antiperspirant

1

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

actually *causes* and *creates* the "white marks" and yellow stains that it summarily claims not to cause.

4.      Not only is that fact obvious and apparent from using the product, but it is a scientific fact that that the "yellow stains" and "white marks" that the "Anti Marks Protection" line of antiperspirants claims to "protect" from, and/or be "anti" towards, are in fact *created* and *caused by* that very same active ingredient, Aluminum Zirconium Tetrachlorohydrex GLY ("Aluminum").

5.      This is borne out under simple usage and testing of the Product; the fact it *absolutely* causes white marks on clothing is readily apparent to any user after purchasing the Product.  Indeed, plaintiff noticed this fact – the causation of white marks on his clothing – immediately after purchasing and using the Product.

6.      Notably, because it is scientifically well-established that aluminum in some antiperspirants causes white marks and staining, there are numerous other brands of "antiperspirants" on the market that do not contain aluminum and therefore can *legitimately* claim to be have "anti mark protection" and/or cause "no white marks" and/or "no yellow stains." [1]  The "Anti Marks Protection" antiperspirant, despite posing as such, is no such product.  The product does absolutely nothing to decrease, lessen or reduce white marks – it creates them.

7.      The fact that *legitimate* anti-stain and anti-white-mark antiperspirant exist on the market renders Unilever's deception all the more convincing to consumers; a consumer does not simply take for granted that all antiperspirants cause white marks.  Rather, a consumer has reason to believe that "Anti Marks Protection" lives up to its claims and *does not cause* white marks or yellow stains clothing, *not* that it simply does so to a lesser extent than "normal" antiperspirant or deodorant.

8.      Yet, in reality, the "Anti Marks Protection" line of antiperspirant actually *causes* the very problems Unilever deceptively claim it *does not* cause. Even if the product actually causes/results in less

---

[1] These brands include peptide-based products such as Klima Hyper-Dri Antiperspirant Serum and Perspi-Guard Maximum Strength Antiperspirant.

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

marks or yellow stains compared to other brands or other products (which is not apparent), the fact it causes or results in such white marks and yellow stains *at all* makes its claims false and misleading.

9.      Importantly, nowhere on the product are there any indications that the product "leaves no marks" or "no yellow stains" *in comparison to "regular" deodorant or antiperspirant brands.* Rather, the product simply and unqualifiedly claims to leave "no marks" and cause "no yellow stains," conditions it, in reality, causes.

10.     In short, while "Anti Marks Protection" is expressly claimed (in addition to its mere name) as being "anti" marks, and leaving "no white marks" and causing "no yellow stains," it causes the very problem it claims to solve, leaving white marks on clothing and causing yellow stains.

11.     The Product is marketed and sold pursuant to *numerous* completely false claims and/or purported benefits.

12.     Pursuant to the MMPA, such practice is illegal.

13.     In addition and/or in the alternative to the above, since the initial offering of the Product, each and every container of the Product has borne a uniformly-worded label falsely claiming the Product causes and/or produces "No Yellow Stains" and "No White Marks." That uniformly-worded false statement gives rise to additional and/or alternative claims on behalf of a nationwide class of similarly-situated consumers.

## II.      PARTIES, JURISDICTION, AND VENUE

14.     Plaintiff Michael Muller is a citizen and resident of St. Louis County, Missouri.

15.     Plaintiff brings this Class Action Petition individually and on behalf of a putative nationwide class of all United States consumers and, additionally or alternatively, a putative class of Missouri residents.

16.     Defendant Conopco, Inc. *d/b/a* "Unilever" (hereinafter "Unilever") is a New York corporation having its principal place of business at 700 Sylvan Ave., Englewood Cliffs, NJ 07632.

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

Unilever may be served at: CT Corporation System, 120 South Central Ave., Clayton MO 63105.

17.     Defendant Unilever advertises, distributes, markets and sells the "Axe"-branded antiperspirant featuring so-called "Anti-Marks Protection."

18.     The true names and capacities of the Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein.  If necessary, Plaintiff will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

19.     Venue is proper in this Court because Plaintiff resides herein and was injured herein.

20.     This asserted class action comports with Missouri Supreme Court Rule 52.08 and with R.S.Mo. § 407.025(3) of the MMPA.  Plaintiffs' identities can be ascertained from Defendant's records, but are so numerous that simple joinder of all individuals is impracticable.  This action raises questions of law and fact common among Plaintiffs.  The claims of lead Plaintiff is typical of all Plaintiffs' claims. Named Plaintiff will fairly and adequately protect all Plaintiffs' interests, and is represented by attorneys qualified to pursue this action. More specifically:

21.     <u>Class and Subclass definitions</u>:  Plaintiff Michael Muller brings this action on behalf of himself and a nationwide class of similarly-situated persons preliminarily-[2]defined as follows: All persons who purchased "Axe"-branded antiperspirant featuring so-called "Anti-Marks Protection" (the "Product")[3] during the Class Period in the United States.  In addition, and/or alternatively, Plaintiff Michael Muller brings this action on behalf of himself and a Missouri subclass of similarly-situated persons defined as follows: All persons, who, within the Class Period, purchased the Product in the State of Missouri. The Class Period begins five years prior to the date of the filing of this Petition, and ceases

---

[2] Plaintiff reserves the right to propose, as needed, any different or other more- or less-specific class, classes, subclass, or subclasses as Plaintiff deems appropriate for purposes of class certification.
[3] As that term and label is defined in greater detail *infra.*

4

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

upon the date of the filing of this Petition. Excluded from the Class and Subclass are: (a) any judges presiding over this action and members of their staffs and families; (b) the Defendants and their subsidiaries, parents, successors, and predecessors; any entity in which the Defendants or their parents have a controlling interest; and the Defendants' current or former officers and directors; (c) employees (i) who have or had a managerial responsibility on behalf of the organization, (ii) whose act or omission in connection with this matter may be imputed to the organization for liability purposes, or (iii) whose statements may constitute an admission on the part of the Defendants; (d) persons who properly execute and file a timely request for exclusion from the class; (e) the attorneys working on the Plaintiffs' claims; (f) the legal representatives, successors, or assigns of any such excluded persons; and (g) any individual who assisted or supported the wrongful acts delineated herein.

22.    <u>Numerosity</u>:  Upon information and belief, the Class and Subclass include tens of thousands, if not hundreds of thousands, of individuals on a nationwide and/or statewide basis, making their individual joinder impracticable. Although the exact number of Class and Subclass members and their addresses are presently unknown to Plaintiff, they are ascertainable from Defendant's records.

23.    <u>Typicality</u>: Plaintiff's claims are typical of those of the Class and Subclass because all Plaintiffs were injured by the Defendant's uniform wrongful conduct, specifically, using misleading and deceptive marketing and advertising in offering and selling the Product to Plaintiffs.

24.    <u>Adequacy</u>:  Plaintiff Michael Muller is an adequate representative of the Class and/or Subclass because his interests do not conflict with the interests of the Class or Subclass members he seeks to represent, he has retained competent and experienced counsel, and he intends to prosecute this action vigorously. The interests of the Class and Subclass will be protected fairly and adequately by Plaintiff and his counsel.

25.    <u>Commonality</u>:  Common questions of law and fact exist as to all Class and Subclass members and predominate over any questions affecting only individual members, such as: (a) whether

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

the Defendant used deceptive or misleading marketing and advertising in selling the Product; (b) whether and to what extent the Class and Subclass members were injured by Defendant's illegal conduct; (c) whether the Class and Subclass members are entitled to compensatory damages; (d) whether the Class and Subclass members are entitled to punitive damages; (e) whether the Class and Subclass members are entitled to declaratory relief; and (f) whether the Class and Subclass members are entitled to injunctive relief.

26.     <u>Superiority</u>:  This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy.  The damages suffered by the individual Class and Subclass members will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by the Defendant's wrongful conduct.  Thus, it would be extremely difficult for the individual Class and Subclass members to obtain effective relief.  A class action presents far fewer management difficulties and provides the benefits of a single adjudication, including economies of time, effort, and expense, and uniformity of decisions.

## III.     <u>BACKGROUND</u>

27.     Defendant manufactures, distributes, and/or sells the product at issue herein, "Axe"-branded antiperspirant featuring so-called "Anti Marks Protection."

28.     Defendant Unilever, in particular, owns the "Axe" brand and, under that brand name, manufactures and distributes, *inter alia,* the "Axe"-branded antiperspirant featuring so-called "Anti-Marks Protection."

29.     The "Anti Marks Protection" line of products is marketed for having, *inter alia,* "a unique formula with anti white marks and yellow stains protection," and, simply causing or creating "no white

6

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

marks" and/or "no yellow stains."[4]

30.      As used herein, the term "Product" refers to all varieties of "Axe"-branded antiperspirant

featuring so-called "Anti-Marks Protection," including the following scents:

     a.   "Gold Original"

     b.   "Signature Gold"

     c.   "Signature Night"

     d.   "48HR Charge Up Protection"

     e.   "Signature Island"

31.      The ingredients in all varieties of the "Axe"-branded antiperspirant featuring so-called

"Anti-Marks Protection" are materially the same, all varieties are marketed and sold in white containers

(as opposed to black for the "normal" Axe antiperspirant), and all varieties bear the same marketing

claims discussed *infra* on their containers; thus, all varieties are substantially similar so as to be treated

collectively as the "Product" as that term is hereinafter used in this Petition.

32.      The Product's container appears as follows, for example (three varieties are shown):



     a.

33.      As shown, the Product comes in white containers for all varieties, distinguishing the

---

[4] *See, e.g.,* https://www.axe.com/us/en/products/deodorant-antiperspirant/antiperspirant/gold-original-antiperspirant-deodorant-stick.html

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

Product from Axe's non-"Anti Marks Protection" line of products.

34.     Looking more closely at the packaging/container, multiple false claims are made on the container itself:



   a.

35.     The front of the container for the Product claims that the Product is "Anti Marks."

36.     In addition, also on the front of the Product, the lid of the container asserts "No Yellow Stains" and "No White Marks."

37.     On the back, the container claims that the Product has "Anti Marks *Protection*"

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

(emphasis added).

38.     Moreover, the back of the container asserts that the Product: "protects your shirts from white marks and yellow stains."

39.     However, the active ingredient in the Product is Aluminum Zirconium Tetrachlorohydrex GLY.  It has long been recognized, and is well-accepted, that "yellow stains" and "white marks" on clothing is *caused* by aluminum in antiperspirants (generally upon being mixed with a user's perspiration).

40.     *A fortiori,* simple usage of the Product by any user after purchasing the same reveals that the Product *absolutely* leaves white marks on clothing.  In fact, Plaintiff discovered, after purchasing the Product, that it left white marks on every color of clothing he used it with after being applied to his skin. Moreover, after using the Product for a while, Plaintiff also began to notice yellow stains on the shirts that he wore after applying the Product.

41.     While the Product hypothetically might fact cause *less* staining and/or white marks than Axe's non-"Anti Mark Protection" antiperspirant (which is *not* apparent), the Product will inevitably lead and contribute to more staining on clothing than when it is not used at all.

42.     Thus, regardless of the extent it does so, the Product causes, at least indirectly, the exact condition – "white marks" and "yellow stains" that it purports to "protect from" and/or be "anti"-towards, and/or cause/create "no" amount of.

43.     Moreover, nowhere on the product are there any indications that the product causes "no marks" or "no yellow stains" *in comparison to "regular" deodorant or antiperspirant brands.*  Rather, the product simply and unqualifiedly claims to leave "no white marks" and/or cause "no yellow stains."

44.     Yet, upon being used by Plaintiff, it became obvious that the Product caused both white marks and yellow stains on his clothing, exactly the opposite of the Product's claims.

45.     Adding yet another layer of deception to Defendant's marketing and selling of the

Product, in addition to the fact that Aluminum Zirconium Tetrachlorohydrex GLY actually *causes* yellow staining and that the product clearly creates white marks on clothing, the Product is otherwise completely absent of any ingredient that could be considered capable of giving it a benefit of "protecting" against stains or marks; thus, on information and belief (and as confirmed by Plaintiff's usage of the Product) the claim of "protecting" against marks and stains is also patently false.

46.      This additional layer of deception is illustrated by the fact that, despite Defendant's claiming the Product is "a unique formula with anti white marks and yellow stains protection," compared to the non-"Anti Marks Protection" "Axe" antiperspirant, the Product does not have a single ingredient not contained in at least one variety of the non-"Anti Marks Protection" except for silica.

47.      According to Unilever's Axe-branded website, www.axe.com, and confirmed by corresponding product packaging, the Product contains the following ingredients:

     a.   Active Ingredient: Aluminum Zirconium Tetrachlorohydrex GLY

     b.   Inactive Ingredients:

          i.   Cyclopentasiloxane, PPG-14 Butyl Ether, Stearyl Alcohol, Polyethylene, Hydrogenated Castor Oil, PEG-8 Distearate, Fragrance (Parfum), Silica, BHT.

48.      The *only* additional ingredient in the Product not found in at least one other variety of non-"Anti Marks Protection" Axe antiperspirant is silica.

49.      Yet silica is merely added to deodorant to help absorb moisture from sweat; upon information and belief, silica does not provide any "protection" from "yellow stains" and/or white marks; indeed, as to white marks, Plaintiff's usage of the Product reveals that it *causes* them as opposed to "protecting" against them.

50.      In short, there is no ingredient in the Product that provides "protection" from white marks or yellow stains as claimed.

10

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

51.     Nor is there any ingredient in the Product that could legitimately be considered as rendering the Product "anti white marks" or "anti yellow stains."

52.     Merriam- Webster online dictionary defines the word "anti" as meaning, *inter alia,* "serving to prevent, cure, or alleviate" or "combating or defending against;"[5] the Product, containing ingredients that *cause* staining and white marks, is unquestionably *not* fairly or honestly characterized as "anti-yellow stains" or "anti-white marks." The product does absolutely nothing to decrease, lessen or reduce stains or white marks – it creates them.

53.     Similarly, claims of "no white marks", and especially claims of "no yellow stains" are false in light of the fact that yellow staining is caused by Aluminum Zirconium Tetrachlorohydrex GLY, the active ingredient in the Product, and the Product, when used by Plaintiff, clearly leaves "white marks" on clothing.

54.     Notably, because it is scientifically well-established that aluminum in some antiperspirants causes white marks and staining, there are other brands of antiperspirant on the market that do not contain aluminum and therefore can *legitimately* claim to "leave no white marks" and/or cause "no yellow stains." Defendant's "Anti Marks Protection," despite posing as such, is no such product.

55.     The fact that *legitimate* anti-stain and anti-white-mark antiperspirants exist on the market renders Unilever's deception all the more convincing to consumers; a consumer does not simply take for granted that all antiperspirants cause white marks and stains.  Rather a consumer has reason to believe that the "Anti Marks Protection" antiperspirant categorically *does not cause* white marks or yellow stains, *not* that it simply does so to a lesser extent than "normal" antiperspirants.

56.     While the fact is extremely well-established, a normal consumer also is unaware that

---

[5] https://www.merriam-webster.com/dictionary/anti

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

Aluminum Zirconium Tetrachlorohydrex GLY is a key factor that contributes to and, at least indirectly, *causes* the "yellow stains" and "white marks" the Product purports to provide "protection from."

57.     In addition, a user is not able to test the Product, which reveals that it unquestionably creates white marks, until after purchasing the Product.

58.     Upon information and belief, Defendant Unilever deceptively and misleadingly markets the Product as falsely providing "protection" from marks, and/or being "anti marks" in order to deceive consumers into believing those claims and purchasing the Product.

59.     Defendant's marketing and selling of the Product by use of the aforementioned false, deceptive, and misleading statements is illegal and prohibited under the MMPA.

*Allegations Relating Specifically to Claims of the Nationwide Class*

60.     As noted, *supra,* since the initial offering of the Product, each and every container of the Product has borne a uniformly-worded label falsely claiming the Product causes and/or produces "No Yellow Stains" and "No White Marks" (hereinafter "False Claims").

61.     In reality, scientific testing and analysis, as well as usage by plaintiff of the Product reveals the falsity of the False Claims; the Product readily leave white marks on multiple colors of clothing, whether when directly contacting clothing or when transferred to clothing after application to a user's skin. As noted, this exact phenomenon occurred numerous times for Plaintiff after purchasing and using the Product; he found that whether some product inadvertently got directly on his clothing, or whether the product was simply transferred to his clothing from his skin after application, it absolutely created white marks on *all* colors of her clothing.  This was despite Plaintiff using the product as specifically directed by Defendant – Plaintiff still noticed white marks on his clothing.

62.     Moreover, not only does the Product readily leave white marks on multiple colors of clothing, when transferred to clothing from a user's body and mixed with perspiration, over time, the Product also creates yellow stains on clothing.  Plaintiff also observed this phenomenon, as the clothing

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

he wore while using the Product, over time, began to develop yellow stains.

63.     Defendant, as developer, manufacturer, and exclusive seller and distributor of the Product, has been aware since the Product's inception, that the False Claims are in fact false – that the Product leaves white marks and causes yellow stains.

64.     Indeed, Defendant undoubtedly did its own testing of the Product prior to it being offered for sale and, of necessity, such testing would have made Defendant aware that the Product leaves white marks on clothing and causes yellow staining.

65.     Despite this, Defendants purposely made the False Claims in order to induce the false belief in consumers that they were purchasing a product that caused no white marks or yellow stains on their clothing.

66.     Notably, nowhere on the product are there any indications that the product is "Invisible," and/or leaves "no white marks" *in comparison to "regular" deodorant or antiperspirant brands.* Rather, the product simply and unqualifiedly claims to be "Invisible" and/or to leave "no marks," problems and conditions it, in reality, causes.

67.     Plaintiff and the class members purchased the Product with no reason to suspect or know that the Product actually caused white marks and yellow stains.

68.     Defendant possessed specialized knowledge regarding the data and information concerning the chemical formula of the Product and whether the Product would, in fact, cause yellow staining when combined with a user's perspiration.

69.     In fact, in regard to the aspect of the False Claims relating to yellow staining, the Product is a credence good because its purported "no yellow stains" benefit cannot be independently assessed or verified by the consumer at the time of purchase.

70.     In purchasing the Product, Plaintiff and the class members had no choice but to necessarily and justifiably rely upon the False Claims as accurate.

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

71.     Had Plaintiffs known that the False Claims were false, Plaintiffs would not have purchased the Product or would not have paid as much for the Product.

72.     As the direct and proximate result of the False Claims, Plaintiff and the class members have suffered economic injury by being deprived of the benefit of the bargain they were promised by Defendant.

73.     By marketing, selling and distributing the Product to purchasers in Missouri and throughout the United States, Defendant made actionable statements that the Product would cause and/or create and/or lead to "No White Marks" and "No Yellow Stains," and at all times failed to disclose that the Product did in fact cause and/or contribute to white marks and yellow stains.

74.     Defendant engaged in the above-described actionable statements, omissions and concealments with knowledge that the representations were false and/or misleading, and with the intent that consumers rely upon such concealment, suppression and omissions.

75.     Alternatively, Defendant was reckless in not knowing that the False Claims were false and misleading at the time they were made.

76.     As the distributor, marketer, producer, manufacturer, and seller of the Product, Defendant possessed specialized knowledge regarding the data and information concerning the chemical formula of the Product which the Plaintiff and the class members could not and did not review.

77.     All of Plaintiffs' claims are based on misleading statements that violate FDA regulations. Such claims do not seek to impose any additional or different obligations beyond those already required by such FDA regulations.

78.     Further, Plaintiffs' claims arise, *inter alia,* from "front of the box" statements and symbols which are not regulated by the Nutrition Labeling and Education Act.

*Facts Particular to Mike Muller and Representative of the Proposed Class and Subclass*

79.     In or around November of 2020, Plaintiff purchased the Product from a retailer while in

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

Missouri.  He purchased the Product primarily for his personal, family and household use.

80.    At the time he purchased the Product, Plaintiff was unaware of the falsity of the Product's claims and/or the falsity of Defendant's online claims regarding the Product and/or the falsity of the False Claims.

81.    He discovered that such claims were false shortly after purchasing the Product, seeing that it created, *inter alia,* white marks on his clothing of any color even when used as directed.  After using the Product, it was clear to Plaintiff that it did nothing to decrease, lessen, or reduce white marks on his clothing, and that it did *not* leave "no marks"; instead, it obviously caused white marks on all clothing he wore while using the Product.  In addition, over time, Plaintiff began to notice yellow stains developing on his clothing that he wore while using the Product.

82.    If Plaintiff had been aware of the falsity and misleading nature of Defendant's claims regarding the Product, he would not have bought the Product.

83.    When Plaintiff purchased the Product, he was injured by Defendant's illegally deceptive, false, and misleading conduct in marketing and selling the Product.

84.    Specifically, Plaintiff suffered an ascertainable loss because he did not receive the expected benefit of his bargain.

85.    When Plaintiff was purchasing the Product, due to the false claims upon the Product and on Defendant's website, Plaintiff believed that he was receiving a product that had "protection" against white marks and yellow stains and/or would leave "no white marks" and "no yellow stains" on his clothing.  Yet after using the Product, it became obvious that the Product did not do what Plaintiff bargained for; rather, the Product *created* and caused white marks on all colors of his clothing.  In addition, yellow stains began to develop on his clothing.

86.    Especially in light of the fact that non-aluminum containing antiperspirant and deodorant products exist on the market, products that *legitimately* reduce or eliminate white marks and yellow

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

stains, Plaintiff specifically did *not* bargain for a Product that merely led to "no" white marks or yellow stains compared to other antiperspirants; Plaintiff expected to receive a Product that did __not__ *create* white marks *at all*.

87.      The Product was not at all what it was purported to be.  Plaintiff did not receive the value of what he bargained for; instead Plaintiff received a product that unremarkably caused white marks and yellow stains on his clothing.

88.      Consequently, Plaintiff was damaged in the amount of the difference between the value of the Product as represented – as one that led to "no white marks" or "no yellow stains" (such value is approximately what Plaintiff paid), and the actual value of the product as received – because Plaintiff did not want a product that *caused* white marks on his clothing, the actual value to Plaintiff was nothing. Thus, Plaintiff was damaged in the full amount paid for the Product.

89.      Although the aforementioned facts apply to named Plaintiff, for purposes of the proposed class, all that is relevant is that Plaintiff and the class members, United States and Missouri citizens, purchased the Product at a time within the Class Period while in the United States and/or Missouri.

## CAUSES OF ACTION

## COUNTS RELATING TO THE NATIONWIDE CLASS

## COUNT ONE: BREACH OF WARRANTY

90.      Plaintiff hereby incorporates by reference and re-alleges each allegation set forth in each preceding paragraph of this Second Amended Complaint.

91.      Defendant sold the Product in its regular course of business.  Plaintiff and the class members purchased the Product.

92.      Defendant made promises and representations in an express warranty provided to all consumers, namely the False Claims -- that the Product would cause, create, and or lead to "no white marks" and "no yellow stains."

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

93.     The False Claims became the basis of the bargain between the Defendant and Plaintiff and each class member.

94.     Defendant gave these express warranties to Plaintiff and each class member in written form on the labels of the Product.

95.     Defendant's written affirmations of fact, promises, and/or descriptions as alleged are each a written warranty.

96.     Defendant breached the warranty because the False Claims were false – the Product in fact causes white marks and yellow stains.

97.     The False Claims were false when the sales took place and were undiscoverable to Plaintiff and the class members at the time of purchase.

98.     All conditions precedent to seeking liability under this claim for breach of express warranty have been performed by or on behalf of Plaintiff and the class in terms of paying for the Product.  Defendant had actual notice of the false labeling information and to date has taken no action to remedy its breach of express and implied warranty.

99.     Defendants had actual notice of the false labeling and information and to date have taken no action to remedy their breaches of express warranty.

100.    Specifically on December 14, 2020, Plaintiff Muller, through counsel, sent actual, written notice of Defendants' breach of warranty by way of letter to Defendant Unilever; said letter was received by Unilever on December 18, 2020.

101.    Defendant previously knew or should have known of the falsity of the False Claims on the Product due to, *inter alia,* Defendant's testing and use of the Product.

102.    Defendant has nonetheless refused to remedy such breaches.

103.    By placing the Product in the stream of commerce, and by operation of law and the facts alleged herein, Defendants also impliedly warrantied to Plaintiff and the class members that the Products

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

were accurately labeled in conformance with the law.

104.    Defendant's breaches of warranty have caused Plaintiffs and class members to suffer injuries, paying for falsely labeled products, and entering into transactions they otherwise would not have entered into for the consideration paid.  As a direct and proximate result of Defendant's breaches of warranty, Plaintiff and class members have suffered damages and continue to suffer damages, including economic damages in terms of the difference between the value of the product as promised and the value of the product as delivered.

105.    As a result of Defendant's breach of these warranties, Plaintiff and class members are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and/or other relied as deemed appropriate, in an amount sufficient to compensate them for not receiving the benefit of their bargain.

## COUNT TWO: BREACH OF IMPLIED CONTRACT (IN THE ALTERNATIVE)

106.    Plaintiff repeats and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

107.    By operation of law, there existed an implied contract for the sale of the Product between Defendant and Plaintiff and each class member who purchased the Product.

108.    By operation of law, there existed an implied duty of good faith and fair dealing in each such contract.

109.    By the acts alleged herein, Defendant has violated that duty of good faith and fair dealing, thereby breaching the implied contract between Defendant and each class member.

110.    As a result of that breach, Plaintiff and each class member suffered damages.

## COUNT THREE: UNJUST ENRICHMENT

111.    Plaintiff repeats and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

112.    Plaintiffs plead their claim for relief in the alternative to the contract claims set forth above.

113.    Plaintiff and the class members have conferred substantial benefits on Defendant by purchasing the Product, and Defendant has knowingly and willfully accepted and enjoyed those benefits.

114.    Defendant either knew or should have known that the payments rendered by Plaintiff and the class members were given and received with the expectation that the Product would be as represented and warranted.   For Defendant to retain the benefit of the payments under these circumstances is inequitable.

115.    Through deliberate misrepresentations or omissions in connection with the advertising, marketing, promotion, and sale of the Products, including the False Claims, Defendant reaped benefits, which result in Defendant wrongfully receiving profits.

116.    Equity demands disgorgement of Defendant's ill-gotten gains.   Defendant will be unjustly enriched unless Defendant is ordered to disgorge those profits for the benefit of Plaintiff and the class members.

117.    As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiffs and the class members are entitled to restitution from Defendant and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendant through this inequitable conduct.

## COUNTS RELATING TO THE MISSOURI SUBCLASS

## COUNT FOUR: VIOLATION OF THE MMPA – Misleading, False, and Deceptive Marketing

118.    Plaintiff hereby incorporates by reference and re-alleges each allegation set forth in each preceding paragraph of this Petition, as though fully set forth herein.

119.    Defendant's acts complained of herein occurred in and emanated from the State of Missouri.

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

120.    Plaintiff and all members of the Missouri Subclass are "persons" and the Product is "merchandise" as those terms are defined under the MMPA.

121.    As set out in this Petition, Defendant's marketing of the Product constitutes deception, false pretense, misrepresentation, unfair practice, or, at a minimum, the concealment, suppression, or omission of a material fact in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. chap. 407 ("MMPA"), in particular, Defendant marketed the Product by falsely claiming, *inter alia,* it would cause "no white marks" and/or cause "no yellow stains."

122.    As a result of Defendant's actions, consumers, including Plaintiff, were misled or deceived that the Product they were purchasing contained benefits it did not, in fact, have.

123.    Defendant's deceptive acts caused Plaintiff and the Missouri Subclass Members an ascertainable loss within the meaning of the MMPA.  In particular, Plaintiff and the Missouri Subclass paid for a Product that did not, in fact, contain any "anti mark protection" benefit and did not create "no white marks" and/or "no yellow stains"; nor did the Product live up to any of the False Claims on its packaging.

124.    Due to Defendant's illegal conduct, Plaintiffs are entitled to restitution of all funds improperly obtained by Defendants.

125.    In addition, Defendant's conduct as aforesaid was wanton, willful, outrageous, and in reckless indifference to the rights of Plaintiffs and others similarly situated and, therefore, warrants the imposition of punitive damages.

126.    Plaintiffs have been forced to hire attorneys to enforce their rights under the MMPA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for an order certifying this action as a Nationwide class action, along with a Missouri subclass, and appointing Plaintiff Mike Muller as Class and Subclass

Electronically Filed - St Louis County - January 25, 2021 - 02:28 PM

representative and his counsel as class counsel.  Plaintiff requests that this court find that the Defendant is liable pursuant to the aforementioned nationwide claims; and/or violated the MMPA, and award Plaintiffs compensatory damages, restitution, attorneys' fees, punitive damages, costs, and such further relief as the Court deems just.

Respectfully submitted,

**DANIEL F. HARVATH, ESQ.**

By: /s/ *Daniel F. Harvath*
Daniel F. Harvath, #57599MO
**HARVATH LAW GROUP, LLC**
75 W. Lockwood, Suite #1
Webster Groves, MO 63119
(314) 550-3717
dharvath@harvathlawgroup.com
*Attorney for Plaintiff*

21